# EXHIBIT 1

# IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ROBERT C. BLOM, | ) | Case No. 21-04328 |
| | ) | Chapter 13 |
| Debtor. | ) | Hon. Donald R. Cassling |

## DECLARATION OF MICHAEL DAMORE

I, Michael Damore, General Counsel and Secretary for Asset Remediation, LLC, assignee of Sound Royalties declare pursuant to 28 USC 1746, under penalty of perjury, that the following is true and correct:

1) I am the General Counsel of Asset Remediation, LLC ("Asset Remediation"), assignee of Sound Royalties, LLC. As such, I am authorized to make this Affidavit in support of Asset Remediation's Motion for Stay Relief and Objection to Confirmation of Chapter 13 Plan.

2) I am familiar with the subject claims/account held by Asset Remediation against Debtor Robert Blom (the "Debtor"). It is part of my responsibilities to supervise collection actions/legal proceedings to enforce Asset Remediation's rights against Debtor.

3) I have reviewed the internal records regularly maintained in the ordinary course of Asset Remediation's business and have verified that Debtor has not satisfied his obligations to Asset Remediation. This Declaration contains my findings based on a review of the subject contract and the account records maintained by Asset Remediation with respect to Debtor.

4) This matter concerns receivables assigned by Debtor to Asset Remediation, as assignee of Sound Royalties, LLC. More specifically, Debtor's right to receive digital

royalties/receivables from Sound Exchange were assigned by Debtor under a Royalty Assignment Agreement dated on or about March 6, 2020 of "all of [Blom's] right to receive all payments, including any advances or loans, derived solely from the master recordings ('Masters') (collectively, the 'Assigned Royalties') (defined below) paid by [Blom's] Payment Issuer up to the Minimum Income set forth on Exhibit 1 (collectively the 'Assigned Royalties') ..." A copy of the Royalty Assignment Agreement (the "Agreement") is attached hereto as **Exhibit A** and incorporated herein by reference.

5) Exhibit 1 of the Agreement sets forth the Minimum Income/Assigned Royalties referenced in Paragraph 5. above, broken down over four (4) years. UCC-1 Statements were also filed securing Debtor's obligations. Debtor has completed several prior, similar contracts with Asset Remediation.

6) The total amount of the Assigned Royalties is and was $131,316.73.

7) Debtor breached the Agreement, by amongst other actions, unlawfully re-directing the subject receivables from the payment issuer Sound Exchange to an address other than that agreed to by the Parties under the Agreement in express violation of the Agreement and all representations, obligations and warranties made by Debtor to Asset Remediation under said Agreement.

8) As a result of Debtor's deliberate and express violations of the Agreement, Asset Remediation commenced a State Action to enforce its claims and interests against Debtor on or about January 22, 2021.

9) A Motion for Default was filed in the State Action on or about March 17, 2021, but has not been entered.

10) In response to the instant Chapter 13 proceeding, Asset Remediation filed a Proof of Claim on or about May 14, 2021.

11) To date, Asset Remediation is due $109.803.23 of its property/receivables. Asset Remediation seeks Stay Relief to conclude its State law action and to enforce any Judgment and claims thereof against Debtor and until all claims and obligations of Debtor to Asset Remediation are satisfied.

_/s/ Michael Damore_
Michael Damore

# EXHIBIT A



# Exhibit "A"

## ROYALTY ASSIGNMENT AGREEMENT

THIS ROYALTY ASSIGNMENT AGREEMENT ("Agreement") is entered into as of March _6_, 2020 (hereafter the "Effective Date"), by Sound Royalties, LLC, having a principal place of business at 1641 Worthington Road, Suite 410 West Palm Beach, FL 33409 ("Assignee"), and Robert Blom, having a residence/principal place of business at 2802 S Riverside Dr, McHenry, IL 60050-2736 ("Assignor").

NOW, THEREFORE, for valuable consideration, Assignee and Assignor agree as follows:

1. **Assignment**.

    a. In consideration of the sum of $68,654.83, less a $1,514.60 closing fee paid to Assignee ("Assignment Price"), to be paid by Assignee to Assignor as provided herein, Assignor hereby sells, transfers, absolutely assigns, and conveys to Assignee all of Assignor's right to receive all payments, including any advances or loans, derived solely from the master recordings ("Masters") (collectively, the "Assigned Royalties"). (defined below) paid by Assignor's Payment Issuer up to the Minimum Income set forth on Exhibit 1 (collectively, the "Assigned Royalties"). "Masters" means and includes, individually and collectively, all of the master recordings listed, referenced or referred to on "Schedule A" attached hereto and incorporated by reference herein. **Nothing in this Agreement shall be deemed to be a sale of Assignors catalog of Master's or grant Assignee any rights in any copyright owned by Assignor.**

    b. (i) As of the Effective Date and subject to the terms of this Agreement, Assignee shall be entitled to receive all Assigned Royalties directly from Sound Exchange ("Payment Issuer") with whom Assignor is affiliated or a member as of the date hereof and from whom Assignor receives all Assigned Royalties ("Assignor's Payment Issuer"). Accordingly, Assignor shall direct, and take all action necessary and/or required (including the actions required by Section 6 of this Agreement) to cause, Assignor's Payment Issuer to pay the Assigned Royalties, regardless of when earned, directly to Assignee.

    (ii) **Assignor's Sound Exchange** Featured Artist and Rights Owner account number is 1000129403 ("Assignor's Payment Issuer Account").

    c. The Assignment Price shall be payable to Assignor promptly following the later of: (i) Assignee's receipt of evidence satisfactory to Assignee that all of Assignor's representations in Paragraph 3 below are true and correct; (ii) the mutual execution and delivery of this Agreement; and (iii) written confirmation from Assignor's Payment Issuer reasonably acceptable to Assignee that the Assigned Royalties shall be paid to Assignee. Assignor can choose to be paid by wire transfer or by check. If Assignor elects to be paid by some other

means, any charges imposed by the bank or money transfer service will be deducted from the Assignment Price. In the event that the transaction contemplated by this Agreement does not fund within 30 days of the Effective Date, Assignee shall have the option to terminate this Agreement with no further obligation to Assignor.

    d.    **This transaction is an assignment of all or a portion of the Assigned Royalties, not a loan.** Assignee shall be responsible for the income taxes attributable to the Assigned Royalties assigned by this Agreement and shall report such payments as income. Assignee shall issue a 1099 to Assignor for the Assignment Price. In the event that the Assignor's Payment Issuer reports the Assigned Royalties as income to the Assignor, such reporting shall be irrelevant to the determination of the tax liability.

2.    **Assignor Protections.** Assignee and Assignor have estimated the amount of income that the Assigned Royalties will produce during the first 48 months after the Effective Date, and this estimated income is itemized on Exhibit 1 to the Agreement (the "Minimum Income"). In order to mitigate the risk to Assignor of unexpected increases in the amount of the payments from the Assigned Royalties, Assignee and Assignor agree to the following provisions to provide certain protections to Assignor as to any increases in the value of the Assigned Royalties after the Effective Date:

    a.    *Increases in Annual Income Generated by Assigned Royalties*: If the cumulative payments received by Assignee as a result of the Assigned Royalties exceed the annual Minimum Income stated on Exhibit 1 in any year, Assignee agrees to pay to Assignor any such overage within 15 days of receipt. (the "Excess Funds"). Assignee's obligation to make this payment shall be expressly contingent on Assignor's full compliance with the Agreement in all respects, including Assignee's receipt of the Minimum Income for all prior years and that no unpaid costs, expenses, or any other amounts are due from Assignor to Assignee under this Agreement. In determining Assignee's obligations under this paragraph, the parties agree that the time periods set in this provision shall commence upon the Effective Date.

    b.    *Early Repurchase Option*: At any point prior to the Termination Date, Assignor shall have the right to repurchase the Assigned Royalties from Assignee by paying to Assignee an amount equal to the Minimum Income minus the total amount of Assigned Royalties Assignee has received as of the repurchase date. Upon such payment to Assignee, Assignee shall terminate this Agreement and execute any necessary documents to assign, transfer, and convey the Assigned Royalties to Assignor. The Assignor's ability to buy back the Assigned Royalties under this sub-paragraph (b) shall be strictly construed on the terms stated herein.

    c.    *Delayed Repurchase Rights*: At any point after that date that is greater than 48 months after the Effective Date, Assignee shall have the right to terminate Assignor's rights to repurchase any of its interests in the Assigned Royalties by written notice of such proposed termination to Assignor, which shall provide Assignor 30 days' notice and opportunity to exercise the delayed repurchase option granted in this sub-paragraph (c). If Assignee has not terminated such repurchase rights, however, Assignor shall retain the right to exercise a delayed repurchase of the Assigned Royalties by paying the Repurchase Amount, plus an increase of such amount by 5% per quarter (commencing 48 months after the Effective Date) until such aggregate amount is paid (this amount shall be referred to as the "Delayed Repurchase

Amount"). The date of Assignee's actual receipt, if any, of the Early Repurchase, or the Delayed Repurchase Amount shall be referred to as the "Termination Date."

d. *Credits for Income Received by Assignee*: In calculating the amounts of the Early Repurchase, and/or the Delayed Repurchase Amount, Assignee and Assignor agree that any and all amounts received by Assignee as a result of the Assigned Royalties shall be credited to Assignor in such calculations, provided that all Costs (defined below) and any other amounts due to Assignee under this Agreement have been paid and/or set-off, as provided by this Agreement.

3. **Assignor's Representations, Warranties and Covenants**. Assignor hereby represents, warrants and covenants to Assignee that as of the Effective Date all of the following are accurate and that Assignee shall rely upon such representations in completing the transaction contemplated by this Agreement:

a. Assignor: (i) owns the Assigned Royalties free and clear of any mortgage, pledge, lien, charge, security interest, encumbrance, restriction or adverse claim of any nature whatsoever (collectively, "Liens"), other than any tax obligation that Assignor must satisfy in connection with assignment of the Assigned Royalties hereunder; (ii) is not aware of any Liens being asserted against the Assigned Royalties; (iii) has not consented to the imposition of any Liens on the Assigned Royalties; and (iv) has not sold, assigned, transferred or otherwise encumbered any of Assignor's rights in the Assigned Royalties to any person or entity other than Assignee. Assignor does not receive Assigned Royalties from any Payment Issuer or other party other than Assignor's Payment Issuer.

b. Assignor is competent to enter into (and understands the terms of) this Agreement and has been represented by tax and accounting advisors and legal counsel in the negotiation and execution of this Agreement, or knowingly waived Assignor's right to do so.

c. Assignor acknowledges that the Assignment Price represents the reasonably equivalent present value of the Masters and the Assigned Royalties, after discounting the future Assigned Royalties to their current present value and taking into account the risk that some or all of the Assigned Royalties may never be paid or payment may be delayed; and Assignor is not entering into this Agreement with the intent to hinder, delay or defraud any of Assignor's creditors, but rather to receive a guaranteed cash payment from Assignee now and to avoid the delay and uncertainty associated with future royalties.

d. Assignor intends to (and shall) fully and timely satisfy all tax obligations of Assignor flowing from this Agreement, either from the proceeds Assignor receives from Assignee hereunder or from other assets of Assignor.

e. If Assignor is married, then Assignor has discussed this transaction with his or her spouse, and such spouse has expressly approved this transaction by executing the Spousal Consent included in Exhibit 2 and expressly waived any marital property right he or she may have in the Assigned Royalties.

f. Assignor shall indemnify, defend and hold harmless Assignee, its agents, attorneys, employees, officers, directors, successors and assigns (collectively, the Indemnified Parties") from and against all claims, losses, damages, penalties, judgments, lawsuits and all related costs and expenses of any nature, including attorney's fees and costs in any proceeding to

enforce or defend Assignee's rights under this Agreement (collectively, "Costs"), which may be incurred by or asserted against any of the Indemnified Parties arising out of, related to, or in connection with, this Agreement or any rights assigned or granted to Assignee hereunder, the Masters, or any breach or alleged breach by Assignor of Assignor's obligations, agreements, covenants, representations and/or warranties in this Agreement. Notwithstanding anything to the contrary contained herein: (i) the Minimum Income shall be automatically increased by an amount equal to any and all Costs to which Assignor's indemnity applies which have not been reimbursed to the Indemnified Parties by Assignor; and (ii) without limiting Assignee's rights or remedies in any manner, Assignee shall have the right to give written notice to Assignor's Payment Issuer to direct payment to Assignee of an amount equal to any and all Costs to which Assignor's indemnity applies from any and all royalties or other sums payable by Assignor's Payment Issuer to Assignor or to any publishing entity owned or controlled by Assignor (in whole or in part).

    g.    Assignor hereby agrees that, if at any time prior to the Termination Date, Assignor receives any payment from Assignor's Payment Issuer in respect of the Assigned Royalties, any such amounts received by Assignor will be received for the account of Assignee and will be held in trust for Assignee's benefit and paid over to Assignee immediately upon receipt by Assignor.

    h.    Assignor has all necessary right, power, legal capacity and authority, and all necessary actions on the part of Assignor (including action required to be taken by Assignor's officers, directors, shareholders, trustees, executors or representatives) have been duly and validly taken to authorize Assignor: (i) to own the Assigned Royalties; (ii) to sell, assign and transfer the Assigned Royalties as provided herein; (iii) to effectuate the execution and delivery of this Agreement; (iv) to execute and deliver those documents and instruments referred to in the Schedules and Exhibits of this Agreement, and all other reasonably necessary documents or instruments contemplated hereby; and (v) to perform the terms, conditions, and obligations hereof and the transactions contemplated hereby. No approvals or consents of any persons or entities other than Assignor are necessary in connection therewith. This Agreement is legal, valid, and binding upon Assignor and is enforceable in accordance with its terms.

    i.    No person holds a power of attorney on behalf of Assignor affecting, directly or indirectly, the interests which are the subject matter of this Agreement.

    j.    As of the date of execution of this Agreement, Assignor has no outstanding, unrecouped, and unearned advances in respect of or affecting the Assigned Royalties.

    k.    All federal, state and local taxes accrued or owing to and including the date of execution of this Agreement arising out of or in connection with the Assigned Royalties, including without limitation, any sales or transfer taxes resulting from the transaction contemplated herein, if any, have been or will be paid or caused to be paid by Assignor. The Assigned Royalties are free and clear of any and all liens, charges, mortgages, pledges, claims (including ownership or copyright claims of parties other than Assignor or Assignor's Payment Issuer), encumbrances, obligations or liabilities of any kind or nature whatsoever whether accrued, absolute, contingent or otherwise.

    l.    Assignor has had the opportunity to obtain legal, financial, and tax advice, and Assignor has not received or relied on legal, financial, or tax advice from Assignee or its agents.

  m. Assignor shall execute any documents required to effectuate the terms and performance of this Agreement, including the following documents attached to this Agreement as Collective Exhibit 2: (i) Spousal Consent; (ii) Funding Instructions; (iii) Return of Non-Assigned Payments; (iv) Authorization to Release Information; (v) a direct pay authorization; and (vi) Sound Exchange Assignment Form (and any such other forms as Assignor's Payment Issuer may require).

  n. Assignor hereby irrevocably grants Assignee a limited power of attorney and appoints Assignee as its attorney-in-fact to take all actions necessary to receive, deposit, and negotiate all checks, remittances or payments of any kind relating to the Assigned Royalties to effectuate the purpose of this Agreement.

  o. Assignor understands that if Assignor is subject to back up tax withholding or other law or order, Assignee will withhold such required amounts from the Assignment Price and remit such payment in accordance with applicable law or order.

  p. Assignor acknowledges and understands that when processing Assignor's assignment of the Assigned Royalties to Assignee in accordance with this Agreement, Assignor's Payment Issuer may change the payment period of Assignor's royalty payments.

  q. Assignor represents and warrants that the Assignment Price will be used for a business or commercial purpose and not used for personal, family or household purposes. Additionally, the transaction contemplated by this Agreement is the assignment of business assets to Assignee.

4. **Termination of Assignment; Return of Excess Assigned Royalties**. Upon Assignee's receipt of the Minimum Income, or if the Assignor exercises of its repurchase rights described in Paragraph 2, the rights granted and assignments made to Assignee in subparagraphs 1.a and 1.b above shall terminate automatically upon the Termination Date. If Assignee receives any Assigned Royalties after the Termination Date, then Assignee shall refund such Assigned Royalties to Assignor within fourteen (14) business days of Assignee's receipt thereof.

5. **Continuation of Payment Issuer Affiliation Agreements**.

  a. Until the Termination Date, Assignor covenants and agrees that Assignor: (i) will not voluntarily terminate Assignor's affiliation or membership agreements with Assignor's Payment Issuer ("Assignor's Affiliation Agreements"); (ii) will use Assignor's best efforts to avoid any involuntary termination of Assignor's Affiliation Agreements; (iii) will use Assignor's best efforts to prevent any of the representations or the warranties made by the Assignor hereunder to become untrue or inaccurate in any respect; (iv) shall not accept any advances or take any action that would diminish the Assigned Royalties payable to Assignee; and (v) will register with Assignor's Payment Issuer each and every Composition which, prior to the Termination Date, is commercially exploited or is approved for or licensed for commercial exploitation. In the event that Assignor's Affiliation Agreements expire under their own terms prior to Assignee receiving the Minimum Income, Assignor shall renew such agreements and take all action necessary to ensure that Assignee receives the Assigned Royalties as provided herein.

b.      Without limiting the generality of the foregoing, Assignor agrees that Assignor shall not, prior to the Termination Date, attempt to re-register, remove, move, re-direct or disassociate (each a "change") all or any of the Masters from Assignor's Payment Issuer or any other organization or entity paying Assigned Royalties to Assignee.  Notwithstanding the foregoing, Assignor agrees that if, prior to the Termination Date, Assignor is required by law to re-register, remove, move, re-direct or disassociate all or any of the Masters from Assignor's Payment Issuer or any other organization or entity that is paying Assigned Royalties to Assignee, Assignor agrees to notify, in writing, Assignee at least sixty (60) days in advance of said change. Such notice shall include the titles of all of the Masters which shall be the subject matter of such change, and the particular change to be made.  Assignor further agrees to cooperate with Assignee and take whatever actions are necessary, complete and execute any necessary paperwork, documents and instruments and submit same to the new Payment Issuer (s) so that the entire grant and assignment agreed upon in this Agreement shall continue to be paid to Assignee uninterruptedly.  If Assignor fails to notify Assignee such that Assignee cannot obtain the Assigned Royalties due Assignee under this Agreement within sixty (60) days after any change, Assignor agrees to immediately pay Assignee one hundred percent (100%) of the Assignment Price plus eighteen percent (18%) interest compounded quarterly from the Effective Date. Additionally, Assignor agrees that any royalties collected by Assignor which should have been paid to Assignee under this Agreement will be paid directly to the Assignee by the Assignor within fifteen (15) days after Assignor's receipt thereof. Any delay in payment of such royalties due to Assignee will be subject to payment of interest at a rate of two percent (2%) per month on those amounts.

c.      In order to allow Assignee to track the Assigned Royalties and calculate the Excess Funds due to Assignee, until Assignee receives the Minimum Income, Assignor hereby agrees to provide to Assignee the log in credentials for Assignor's on-line account with Assignor's Payment Issuer, if any. Assignor further agrees not to change the log in credentials until Assignee receives the Minimum Income, and in the event that such credentials have to be changed (for security reasons), Assignor shall immediately provide the revised log in credentials to Assignee.

d.      Until Assignee receives the Minimum Income, Assignor shall not take any action to sell, transfer or assign Assignor's rights in and to the copyright(s) which generate the Assigned Royalties for the Masters.

6.      **Instructions to Assignor's Payment Issuer**.  Simultaneously with the execution of this Agreement, Assignor shall execute the Sound Exchange Assignment Form (the " Payment Issuer Forms") included in Exhibit 2 (and shall execute any such other forms as Assignor's Payment Issuer may require), which Assignee shall deliver to Assignor's Payment Issuer, directing Assignor's Payment Issuer to pay the Assigned Royalties to Assignee.  Assignor shall not attempt to modify the terms of the Payment Issuer Form or notify Assignor's Payment Issuer that Assigned Royalties should no longer be directed to Assignee prior to the Termination Date. Promptly following the Termination Date, Assignee shall notify Assignor's Payment Issuer that the Payment Issuer Form is no longer in effect and, if required by Assignor's Payment Issuer to effect termination of the assignment to Assignee, Assignee shall execute and deliver to Assignor's Payment Issuer an assignment of the Assigned Royalties to Assignor. Assignor

consents to Assignee filing a UCC-1 Financing Statement in the locale and manner as Assignee deems necessary and to provide Publisher with notice of this assignment to perfect Assignee's interest in and to the Assigned Royalties.

7. **Set Off**. Any amounts due to the Assignee under any other agreement between the Assignee and Assignor whether made prior, contemporaneously with, or after this Agreement, may, at any time, be applied to or set off by the Assignee against any amounts due and payable to the Assignee under this Agreement. The Assignee agrees to notify the Assignor promptly after any such application or setoff; provided that any failure by Assignee to so notify the Assignor shall not invalidate any such application or setoff.

8. **Assignment**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs, executors and administrators. Neither party may assign any of its rights hereunder; provided, however, that Assignee may assign this Agreement or any of its rights hereunder to a third party.

9. **Governing Law and Consent to Jurisdiction**. This Agreement is governed by and shall be construed in accordance with the laws of the state of Florida, without regard to conflict of law principles. Any action or proceeding relating in any way to this Agreement may be brought and enforced only in the state courts of Palm Beach County, Florida, and the parties irrevocably submit to the jurisdiction of such courts in respect of any such action or proceeding. The parties irrevocably waive, to the fullest extent permitted by law, any objection that they may now or hereafter have to the laying of venue of any such action or proceeding in the state courts of Palm Beach County, Florida and any claim that any such action or proceeding brought in any such court has been brought in any inconvenient forum. To the fullest extent permitted by law, the parties hereby irrevocably consent to the service of process in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to it at its address as set forth herein. If any legal action or other proceeding is brought for the enforcement of this Agreement or as a result of a breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs insured in such action or proceeding in addition to any other relief to which such party may be entitled.

10. **Confidentiality**. The parties agree to keep this Agreement confidential and not to disclose the existence or the terms to any third parties. However, Assignee shall disclose the Agreement to the Assignor's Payment Issuer to the extent necessary to effectuate the terms of this Agreement.

11.  **Merger Clause**. This Agreement is the entire agreement between the parties and supersedes any negotiations or oral statements made by either party.

Sound Royalties, LLC

By: _____
Its: VP of Operations

_____
Robert Blom
Payment Issuer: Sound Exchange
Featured Artist and Rights Owner
Account number: 1000129403

The foregoing instrument was acknowledged before me this 6th day of March, 2020 by the above signed, who is either (☐) personally known to me or (☑) who has produced ___FL DL___ as identification.

_____
Notary Signature
A Notary Public in and for the State of __FL__
Printed Name: C. Cerda
Commission Expires: _____

OFFICIAL SEAL
C CERDA
Notary Public - State of Illinois
My Commission Expires Dec. 9, 2021

Page 8



Exhibit 1

| Year | Minimum Income |
|---|---|
| 1 | $ 37,971.05 |
| 2 | $ 34,313.98 |
| 3 | $ 31,009.13 |
| 4 | $ 28,022.57 |



Schedule "A"

The term "Masters" includes all musical works registered with Sound Exchange, including but not limited to the attached schedule and any other musical works registered with Sound Exchange after the execution of this Agreement.

Page 10



Exhibit 2
Ancillary Documents

Composite Exhibit "B"

## ASSIGNMENT OF MUSIC ROYALTY RECEIVABLE

For valuable consideration, Sound Royalties, LLC, a Virginia limited liability company ("Sound Royalties"), hereby sells, assigns, transfers, and sets over to SR Funding, LLC, ("SR"), all of the undersigned's right, title and interest in and to all of the following Assigned Royalties, as defined in that certain Royalty Assignment Agreement dated March 06, 2020 (the "Purchase Agreement") between Sound Royalties, LLC and Robert Blom ("Assignor") pursuant to which Assignor sold, transferred and assigned all of Assignor's right, title, and interest in and to certain music royalty payments payable to Sound Royalties. All representations, warranties, obligations, and liabilities of any kind under the foregoing Purchase Agreement (the "Obligations") are and shall be retained by Sound Royalties and are not being transferred or assumed in any way by SR. Sound Royalties shall defend, indemnify and hold SR harmless from and against the payment of any such Obligations.

Assigned Music Royalty Payments: $131,316.72

Dated this 10th day of March, 2020.   **Sound Royalties, LLC**

_____
BY: Barbara Ocasio
ITS: Vice President of Operations

## ASSIGNMENT OF MUSIC ROYALTY RECEIVABLE

For valuable consideration, SR Funding, LLC, ("Seller"), hereby sells, assigns, transfers, and sets over to Asset Remediation, LLC, ("AR"), all of the undersigned's right, title and interest in and to that certain Royalty Assignment Agreement dated March 6 2020 (the "Purchase Agreement") between Sound Royalties, LLC and Robert Blom ("Assignor") pursuant to which Assignor sold, transferred and assigned all of Assignor's right, title, and interest in and to certain music royalty payments payable to Sound Royalties, LLC, as well as any and all claims that Sound Royalties, LLC has or may have against Assignor as a result of the Purchase Price paid to Assignor by Sound Royalties, LLC under the Purchase Agreement.

Assigned Music Royalty Payments: $131,316.72

Dated this 8th day of January, 2021.

SR Funding, LLC

BY: Charles Lowe
ITS: President

57301/8888-20736858v1