# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|                        |     |                              |
|------------------------|-----|------------------------------|
| IN RE:                 | )   |                              |
|                        | )   |                              |
| ROBERT C. BLOM,        | )   | Case No. 21-04328            |
|                        | )   | Chapter 13                   |
| Debtor.                | )   | Hon. Donald R. Cassling      |

## DECLARATION OF MICHAEL DAMORE

I, Michael Damore, General Counsel and Secretary for Asset Remediation, LLC, assignee of Sound Royalties declare pursuant to 28 USC 1746, under penalty of perjury, that the following is true and correct:

1)    I am the General Counsel of Asset Remediation, LLC ("Asset Remediation"), assignee of Sound Royalties, LLC. As such, I am authorized to make this Affidavit in support of Asset Remediation's Motion for Stay Relief and Objection to Confirmation of Chapter 13 Plan.

2)    Attached are three previous contracts that Debtor entered into assigning his royalties. Each contact was successfully paid back by Debtor's royalties.

Michael Damore



EF Specialty Funding, LLC dba

# Encore Funding®

A Novation Ventures Company

## ROYALTY TRANSFER AGREEMENT

THIS ROYALTY TRANSFER AGREEMENT ("Agreement") is entered into as of December 2, 2016 (hereafter the "Effective Date"), by EF Specialty Funding, LLC dba Encore Funding, having a principal place of business at 1641 Worthington Road, Suite 410 West Palm Beach, FL 33409 ("Buyer"), and Robert Blom, having a residence/principal place of business at 2802 S Riverside Dr Mchenry, IL 60050-2736 ("Seller").

NOW, THEREFORE, for valuable consideration, Buyer and Seller agree as follows:

1.  **Purchase and Sale.**

    a.  In consideration of the sum of $34,000.00, less a 10% transaction fee paid to Buyer ("Purchase Price"), to be paid by Buyer to Seller as provided herein, Seller hereby sells, transfers, absolutely assigns, and conveys to Buyer all of Seller's right, title and interest in and to any and all monies derived from the public performance of the Compositions (defined below) (collectively, the "Assigned Royalties"). "Compositions" means and includes, individually and collectively, all of the musical compositions listed, referenced or referred to on "Schedule A" attached hereto and incorporated by reference herein.

    b.  (i)  As of the Effective Date and subject to the terms of this Agreement, Buyer shall be entitled to receive all Assigned Royalties directly from the performing rights organization or society ("PRO") with whom Seller is affiliated or a member as of the date hereof and from whom Seller receives all Assigned Royalties ("Seller's PRO"). Seller previously has identified Seller's PRO for Buyer. Accordingly, Seller shall direct, and take all action necessary and/or required (including the actions required by Section 6 of this Agreement) to cause, Seller's PRO to pay the Assigned Royalties, regardless of when earned, directly to Buyer.

    (ii)  Seller's Sound Exchange PRO account number is 1000129403 ("Seller's PRO Account").

    c.  The Purchase Price shall be payable to Seller promptly following the later of: (i) Buyer's receipt of evidence satisfactory to Buyer that all of Seller's representations in Paragraph 2 below are true and correct; (ii) the mutual execution and delivery of this Agreement; and (iii) written confirmation from Seller's PRO reasonably acceptable to Buyer that the Assigned Royalties shall be paid to Buyer. Seller can choose to be paid by wire transfer or by check. If Seller elects to be paid by some other means, any charges imposed by the bank or money transfer service will be deducted from the Purchase Price.

    d.  This transaction is a sale of all or a portion of the Assigned Royalties, not a loan. Buyer shall be responsible for the income taxes attributable to the Assigned Royalties assigned by this Agreement and shall report such payments as income. Buyer shall issue a 1099 to Seller

for the Purchase Price. In the event that the Seller's PRO reports the Assigned Royalties as income to the Seller, such reporting shall be irrelevant to the determination of the tax liability.

2.     **Seller Protections.** Buyer and Seller have estimated the amount of income that the Assigned Royalties will produce during the first 36 months after the Effective Date, and this estimated income is itemized on Exhibit 1 to the Agreement (the "Minimum Income"). In order to mitigate the risk to Seller of unexpected increases in the amount of the payments from the Assigned Royalties, Buyer and Seller agree to the following provisions to provide certain protections to Seller as to any increases in the value of the Assigned Royalties after the Effective Date:

    a.     *Increases in Annual Income Generated by Assigned Royalties*: If the cumulative annual payments received by Buyer as a result of the Assigned Royalties exceed the amounts of the Minimum Income stated in Exhibit 1 for that twelve-month period, Buyer agrees to pay to Seller any such overage within 15 days of receipt of the overage amount for that time period (the "Excess Funds"). Buyer's obligation to make this payment shall be expressly contingent on Seller's full compliance with the Agreement in all respects, including Buyer's receipt of the Minimum Income for all prior periods and that no unpaid costs, expenses, or any other amounts are due from Seller to Buyer under this Agreement. In determining Buyer's obligations under this paragraph, the parties agree that the time periods set in this provision shall commence upon the Effective Date.

    b.     *Standard Repurchase Option*: At any point on or before 36 months after the Effective Date, Seller shall have the right to repurchase the Assigned Royalties from Buyer by: (a) paying an amount equal to the Minimum Income to Buyer; (b) paying any costs, expenses, or any other amounts due to Buyer under this Agreement (the total amount due under (a) and (b) shall be referred to as the "Repurchase Amount"); and (c) making a written request that Buyer execute any necessary documents to assign, transfer, and convey the Assigned Royalties to Seller.

    c.     *Accelerated Repurchase Option*: On the date that is 24 months after the Effective Date, Seller shall have the right to buy back the Assigned Royalties from Buyer by making a lump-sum payment to Buyer in the amount of $51,725.00, as well as any unpaid costs, expenses, or any other amounts due to Buyer under this Agreement (the "Accelerated Repurchase Amount"). Upon such payment to Seller, Buyer shall terminate this Agreement and execute any necessary documents to assign, transfer, and convey the Assigned Royalties to Seller. This is a one-time, one-day repurchase option. The Seller's ability to buy back the Assigned Royalties under this sub-paragraph (c) shall be strictly construed on the terms stated herein.

    d.     *Delayed Repurchase Rights*: At any point after that date that is greater than 36 months after the Effective Date, Buyer shall have the right to terminate Seller's rights to repurchase any of its interests in the Assigned Royalties by written notice of such proposed termination to Seller, which shall provide Seller 30 days' notice and opportunity to exercise the delayed repurchase option granted in this sub-paragraph (d). If Buyer has not terminated such repurchase rights, however, Seller shall retain the right to exercise a delayed repurchase of the Assigned Royalties by paying the Repurchase Amount, plus an increase of such amount by 5%

per quarter (commencing 36 months after the Effective Date) until such aggregate amount is paid (this amount shall be referred to as the "Delayed Repurchase Amount"). The date of Buyer's actual receipt, if any, of the Repurchase Amount, the Accelerated Repurchase Amount, or the Delayed Repurchase Amount shall be referred to as the "Termination Date."

     e.    *Credits for Income Received by Buyer*: In calculating the amounts of the Repurchase Amount, the Accelerated Repurchase Amount, and/or the Delayed Repurchase Amount, Buyer and Seller agree that any and all amounts received by Buyer as a result of the Assigned Royalties shall be credited to Seller in such calculations, provided that all Costs (defined below) and any other amounts due to Buyer under this Agreement have been paid and/or set-off, as provided by this Agreement.

3.    **Seller's Representations, Warranties and Covenants**.    Seller hereby represents, warrants and covenants to Buyer that as of the Effective Date:

     a.    Seller: (i) owns the Assigned Royalties free and clear of any mortgage, pledge, lien, charge, security interest, encumbrance, restriction or adverse claim of any nature whatsoever (collectively, "Liens"), other than any tax obligation that Seller must satisfy in connection with the purchase and sale of the Assigned Royalties hereunder; (ii) is not aware of any Liens being asserted against the Assigned Royalties; (iii) has not consented to the imposition of any Liens on the Assigned Royalties; and (iv) has not sold, assigned, transferred or otherwise encumbered any of Seller's rights in the Assigned Royalties to any person or entity other than Buyer. Seller does not receive Assigned Royalties from any PRO or other party other than Seller's PRO.

     b.    Seller is competent to enter into (and understands the terms of) this Agreement and has been represented by tax and accounting advisors and legal counsel in the negotiation and execution of this Agreement, or knowingly waived Seller's right to do so.

     c.    Seller acknowledges that the Purchase Price represents the reasonably equivalent present value of the Compositions and the Assigned Royalties, after discounting the future Assigned Royalties to their current present value and taking into account the risk that some or all of the Assigned Royalties may never be paid or payment may be delayed; and Seller is not entering into this Agreement with the intent to hinder, delay or defraud any of Seller's creditors, but rather to receive a guaranteed cash payment from Buyer now and to avoid the delay and uncertainty associated with future royalties.

     d.    Seller intends to (and shall) fully and timely satisfy all tax obligations of Seller flowing from this Agreement, either from the proceeds Seller receives from Buyer hereunder or from other assets of Seller.

     e.    If Seller is married, then Seller has discussed this transaction with his or her spouse, and such spouse has expressly approved this transaction by executing the Spousal Consent included in Exhibit 2 and expressly waived any marital property right he or she may have in the Assigned Royalties.

f.	Seller shall indemnify, defend and hold harmless Buyer, its agents, attorneys, employees, officers, directors, successors and assigns (collectively, the Indemnified Parties") from and against all claims, losses, damages, penalties, judgments, lawsuits and all related costs and expenses of any nature, including attorney's fees and costs in any proceeding to enforce or defend Buyer's rights under this Agreement (collectively, "Costs"), which may be incurred by or asserted against any of the Indemnified Parties arising out of, related to, or in connection with, this Agreement or any rights assigned or granted to Buyer hereunder, the Compositions, or any breach or alleged breach by Seller of Seller's obligations, agreements, covenants, representations and/or warranties in this Agreement. Notwithstanding anything to the contrary contained herein: (i) the Minimum Income shall be automatically increased by an amount equal to any and all Costs to which Seller's indemnity applies which have not been reimbursed to the Indemnified Parties by Seller; and (ii) without limiting Buyer's rights or remedies in any manner, Buyer shall have the right to give written notice to Seller's PROs to direct payment to Buyer of an amount equal to any and all Costs to which Seller's indemnity applies from any and all royalties or other sums payable by Seller's PRO to Seller or to any publishing entity owned or controlled by Seller (in whole or in part).

g.	Seller hereby agrees that, if at any time prior to the Termination Date, Seller receives any payment from Seller's PRO in respect of the Assigned Royalties, any such amounts received by Seller will be received for the account of Buyer and will be held in trust for Buyer's benefit and paid over to Buyer immediately upon receipt by Seller.

h.	Seller has all necessary right, power, legal capacity and authority, and all necessary actions on the part of Seller (including action required to be taken by Seller's officers, directors, shareholders, trustees, executors or representatives) have been duly and validly taken to authorize Seller: (i) to own the Assigned Royalties; (ii) to sell, assign and transfer the Assigned Royalties as provided herein; (iii) to effectuate the execution and delivery of this Agreement; (iv) to execute and deliver those documents and instruments referred to in the Schedules and Exhibits of this Agreement, and all other reasonably necessary documents or instruments contemplated hereby; and (v) to perform the terms, conditions, and obligations hereof and the transactions contemplated hereby. No approvals or consents of any persons or entities other than Seller are necessary in connection therewith. This Agreement is legal, valid, and binding upon Seller and is enforceable in accordance with its terms.

i.	No person holds a power of attorney on behalf of Seller affecting, directly or indirectly, the interests which are the subject matter of this Agreement.

j.	As of the date of execution of this Agreement, Seller has no outstanding, unrecouped, and unearned advances in respect of or affecting the Assigned Royalties.

k.	All federal, state and local taxes accrued or owing to and including the date of execution of this Agreement arising out of or in connection with the Assigned Royalties, including without limitation, any sales or transfer taxes resulting from the transaction contemplated herein, if any, have been or will be paid or caused to be paid by Seller. The Assigned Royalties are free and clear of any and all liens, charges, mortgages, pledges, claims (including ownership or copyright claims of parties other than Seller or Seller's PRO), encumbrances, obligations or liabilities of any kind or nature whatsoever whether accrued, absolute, contingent or otherwise.

l.     Seller has had the opportunity to obtain legal, financial, and tax advice, and Seller has not received or relied on legal, financial, or tax advice from Buyer or its agents.

m.     Seller shall execute any documents required to effectuate the terms and performance of this Agreement, including the following documents attached to this Agreement as Collective Exhibit 2: (i) Spousal Consent; (ii) Funding Instructions; (iii) Return of Non-Assigned Payments; (iv) Authorization to Release Information; (v) a direct pay authorization; and (vi) Sound Exchange Assignment Form (and any such other forms as Seller's PRO may require).

n.     Seller hereby irrevocably grants Buyer a limited power of attorney and appoints Buyer as its attorney-in-fact to take all actions necessary to receive, deposit, and negotiate all checks, remittances or payments of any kind relating to the Assigned Royalties to effectuate the purpose of this Agreement.

o.     Seller understands that if Seller is subject to back up tax withholding or other law or order, Buyer will withhold such required amounts from the Purchase Price and remit such payment in accordance with applicable law or order.

4.     **Termination of Assignment; Return of Excess Assigned Royalties**.  Upon Buyer's receipt of the Minimum Income, or if the Seller exercises of its repurchase rights described in Paragraph 2, the rights granted and assignments made to Buyer in subparagraphs 1.a and 1.b above shall terminate automatically upon the Termination Date.  If Buyer receives any Assigned Royalties after the Termination Date, then Buyer shall refund such Assigned Royalties to Seller within fourteen (14) business days of Buyer's receipt thereof.

5.     **Continuation of PRO Affiliation Agreements**.

a.     Until the Termination Date, Seller covenants and agrees that Seller: (i) will not voluntarily terminate Seller's affiliation or membership agreements with Seller's PRO ("Seller's Affiliation Agreements"); (ii) will use Seller's best efforts to avoid any involuntary termination of Seller's Affiliation Agreements; (iii) will use Seller's best efforts to prevent any of the representations or the warranties made by the Seller hereunder to become untrue or inaccurate in any respect; and (iv) will register with Seller's PRO each and every Composition which, prior to the Termination Date, is commercially exploited or is approved for or licensed for commercial exploitation.

b.     Without limiting the generality of the foregoing, Seller agrees that Seller shall not, prior to the Termination Date, attempt to re-register, remove, move, re-direct or disassociate (each a "change") all or any of the Compositions from Seller's PRO or any other organization or entity paying Assigned Royalties to Buyer.  Notwithstanding the foregoing, Seller agrees that if, prior to the Termination Date, Seller is required by law to re-register, remove, move, re-direct or disassociate all or any of the Compositions from Seller's PRO or any other organization or entity that is paying Assigned Royalties to Buyer, Seller agrees to notify, in writing, Buyer at least sixty (60) days in advance of said change.  Such notice shall include the titles of all of the

Compositions which shall be the subject matter of such change, and the particular change to be made. Seller further agrees to cooperate with Buyer and take whatever actions are necessary, complete and execute any necessary paperwork, documents and instruments and submit same to the new PRO(s) so that the entire grant and assignment agreed upon in this Agreement shall continue to be paid to Buyer uninterruptedly. If Seller fails to notify Buyer such that Buyer cannot obtain the Assigned Royalties due Buyer under this Agreement within sixty (60) days after any change, Seller agrees to immediately pay Buyer one hundred percent (100%) of the Purchase Price plus eighteen percent (18%) interest compounded quarterly from the Effective Date. Additionally, Seller agrees that any royalties collected by Seller which should have been paid to Buyer under this Agreement will be paid directly to the Buyer by the Seller within fifteen (15) days after Seller's receipt thereof. Any delay in payment of such royalties due to Buyer will be subject to payment of interest at a rate of two percent (2%) per month on those amounts.

c.     Until Buyer receives the Minimum Income, Seller hereby grants Buyer the right to control and modify Seller's on-line account with his PRO, including but not limited to change the user name, password, email address, and contact information. To the extent necessary, and at Seller's request, Buyer shall provide Seller with the quarterly statements issued by the PRO.

6.     **Instructions to Seller's PRO**. Simultaneously with the execution of this Agreement, Seller shall execute the Sound Exchange Assignment Form (the "PRO Forms") included in Exhibit 2 (and shall execute any such other forms as Seller's PRO may require), which Buyer shall deliver to Seller's PRO, directing Seller's PRO to pay the Assigned Royalties to Buyer. Seller shall not attempt to modify the terms of the PRO Form or notify Seller's PRO that Assigned Royalties should no longer be directed to Buyer prior to the Termination Date. Promptly following the Termination Date, Buyer shall notify Seller's PRO that the PRO Form is no longer in effect and, if required by Seller's PRO to effect termination of the assignment to Buyer, Buyer shall execute and deliver to Seller's PRO an assignment of the Assigned Royalties to Seller. Seller consents to Buyer filing a UCC-1 Financing Statement in the locale and manner as Buyer deems necessary and to provide Publisher with notice of this assignment to perfect Buyer's interest in and to the Assigned Royalties.

7.     **Set Off**. Any amounts due to the Buyer under any other agreement between the Buyer and Seller, may, at any time after the occurrence of a default under this Agreement or any other agreement between the Buyer and Seller, be applied to or set off by the Buyer against any amounts due and payable to the Buyer under this Agreement. The Buyer agrees to notify the Seller promptly after any such application or setoff; provided that any failure by Buyer to so notify the Seller shall not invalidate any such application or setoff.

8.     **Assignment**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs, executors and

administrators. Neither party may assign any of its rights hereunder; provided, however, that Buyer may assign this Agreement or any of its rights hereunder to a third party.

9.   **Governing Law, Arbitration, and Consent to Jurisdiction**. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, USA (without regard to its conflicts of law doctrines) as if this Agreement were entered into and wholly to be performed therein. Any and all claims or disputes challenging the validity or enforceability of this Agreement or arising from or relating to this Agreement, its formation, terms, and/or the parties' representations, obligations, and performance thereunder will be submitted to binding commercial arbitration conducted in Florida by a single arbitrator selected by the American Arbitration Association (AAA) under AAA's commercial arbitration rules. If any legal action or other proceeding is brought for the enforcement of this Agreement or as a result of a breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs insured in such action or proceeding in addition to any other relief to which such party may be entitled.

EF Specialty Funding, LLC dba Encore Funding

By: _____

Its: VP of Operations

Robert Blom
PRO Account numbers:
Sound Exchange: 1000129403

The foregoing instrument was acknowledged before me this 20th day of December, 2016 by the above signed, who is either (☐) personally known to me or (☑) who has produced Drivers License as identification.

_Tania R. Kibort_
Notary Signature
A Notary Public in and for the State of Illinois County: McHenry
Printed Name: Tania R. Kibort
Commission Expires: November 29, 2020

TANIA R KIBORT
Official Seal
Notary Public - State of Illinois
My Commission Expires Nov 29, 2020



**EF Specialty Funding, LLC dba**

# Encore Funding ®

**A Novation Ventures Company**

Exhibit 1

| Year | Amount |
|------|------------|
| 1 | $ 19,589.88 |
| 2 | $ 17,703.14 |
| 3 | $ 15,998.11 |



EF Specialty Funding, LLC dba

# Encore Funding ®

A Novation Ventures Company

Schedule "A"

The term "Compositions" includes the attached: (i) all musical compositions or works registered to Seller's PRO Accounts (including, but not limited to those musical compositions and works set forth in the schedule below) and (ii) any other musical compositions or works written, owned or controlled by Seller prior to the Termination Date.



Sound
Royalties
Money for all music.

## ROYALTY ASSIGNMENT AGREEMENT

THIS ROYALTY ASSIGNMENT AGREEMENT ("Agreement") is entered into as of April 10, 2018 (hereafter the "Effective Date"), by Sound Royalties, LLC, having a principal place of business at 1641 Worthington Road, Suite 410 West Palm Beach, FL 33409 ("Assignee"), and Robert Blom, having a residence/principal place of business at 2802 S Riverside Dr Mchenry, IL 60050-2736 ("Assignor").

NOW, THEREFORE, for valuable consideration, Assignee and Assignor agree as follows:

1.     **Assignment**.

a.     In consideration of the sum of $32,204.02, less a 8% transaction fee paid to Assignee ("Assignment Price"), to be paid by Assignee to Assignor as provided herein, Assignor hereby sells, transfers, absolutely assigns, and conveys to Assignee all of Assignor's right to receive all payments, including any advances or loans, derived solely from the master recordings ("Masters") (collectively, the "Assigned Royalties"). (defined below) paid by Assignor's Payment Issuer up to the Minimum Income set forth on Exhibit 1 (collectively, the "Assigned Royalties"). "Masters" means and includes, individually and collectively, all of the master recordings listed, referenced or referred to on "Schedule A" attached hereto and incorporated by reference herein. Nothing in this Agreement shall be deemed to be a sale of Assignors catalog of Masters or grant Assignee any rights in any copyright owned by Assignor.

b.     (i)     As of the Effective Date and subject to the terms of this Agreement, Assignee shall be entitled to receive all Assigned Royalties directly from Sound Exchange ("Payment Issuer") with whom Assignor is affiliated or a member as of the date hereof and from whom Assignor receives all Assigned Royalties ("Assignor's Payment Issuer"). Accordingly, Assignor shall direct, and take all action necessary and/or required (including the actions required by Section 6 of this Agreement) to cause, Assignor's Payment Issuer to pay the Assigned Royalties, regardless of when earned, directly to Assignee.

(ii)     Assignor's Sound Exchange Featured Artist account number is 1000129403 ("Assignor's Payment Issuer Account").

c.     The Assignment Price shall be payable to Assignor promptly following the later of: (i) Assignee's receipt of evidence satisfactory to Assignee that all of Assignor's representations in Paragraph 2 below are true and correct; (ii) the mutual execution and delivery of this Agreement; and (iii) written confirmation from Assignor's Payment Issuer reasonably acceptable to Assignee that the Assigned Royalties shall be paid to Assignee. Assignor can choose to be paid by wire transfer or by check. If Assignor elects to be paid by some other

means, any charges imposed by the bank or money transfer service will be deducted from the Assignment Price.

      d.      This transaction is a sale of all or a portion of the Assigned Royalties, not a loan. Assignee shall be responsible for the income taxes attributable to the Assigned Royalties assigned by this Agreement and shall report such payments as income. Assignee shall issue a 1099 to Assignor for the Assignment Price. In the event that the Assignor's Payment Issuer reports the Assigned Royalties as income to the Assignor, such reporting shall be irrelevant to the determination of the tax liability.

2.      **Assignor Protections.** Assignee and Assignor have estimated the amount of income that the Assigned Royalties will produce during the first 36 months after the Effective Date, and this estimated income is itemized on Exhibit 1 to the Agreement (the "Minimum Income"). In order to mitigate the risk to Assignor of unexpected increases in the amount of the payments from the Assigned Royalties, Assignee and Assignor agree to the following provisions to provide certain protections to Assignor as to any increases in the value of the Assigned Royalties after the Effective Date:

      a.      *Increases in Annual Income Generated by Assigned Royalties*: If the cumulative payments received by Assignee as a result of the Assigned Royalties exceed the annual Minimum Income stated on Exhibit 1 in any year, Assignee agrees to pay to Assignor any such overage within 15 days of receipt. (the "Excess Funds"). Assignee's obligation to make this payment shall be expressly contingent on Assignor's full compliance with the Agreement in all respects, including Assignee's receipt of the Minimum Income for all prior years and that no unpaid costs, expenses, or any other amounts are due from Assignor to Assignee under this Agreement. In determining Assignee's obligations under this paragraph, the parties agree that the time periods set in this provision shall commence upon the Effective Date.

      b.      *Early Repurchase Option*: At any point prior to the Termination Date, Assignor shall have the right to repurchase the Assigned Royalties from Assignee by paying to Assignee an amount equal to the Minimum Income minus the total amount of Assigned Royalties Assignee has received as of the repurchase date. Upon such payment to Assignee, Assignee shall terminate this Agreement and execute any necessary documents to assign, transfer, and convey the Assigned Royalties to Assignor. The Assignor's ability to buy back the Assigned Royalties under this sub-paragraph (b) shall be strictly construed on the terms stated herein.

      c.      *Delayed Repurchase Rights*: At any point after that date that is greater than 36 months after the Effective Date, Assignee shall have the right to terminate Assignor's rights to repurchase any of its interests in the Assigned Royalties by written notice of such proposed termination to Assignor, which shall provide Assignor 30 days' notice and opportunity to exercise the delayed repurchase option granted in this sub-paragraph (c). If Assignee has not terminated such repurchase rights, however, Assignor shall retain the right to exercise a delayed repurchase of the Assigned Royalties by paying the Repurchase Amount, plus an increase of such amount by 5% per quarter (commencing 36 months after the Effective Date) until such aggregate amount is paid (this amount shall be referred to as the "Delayed Repurchase Amount"). The date of Assignee's actual receipt, if any, of the Early Repurchase, or the Delayed Repurchase Amount shall be referred to as the "Termination Date."

d. *Credits for Income Received by Assignee*: In calculating the amounts of the Early Repurchase, and/or the Delayed Repurchase Amount, Assignee and Assignor agree that any and all amounts received by Assignee as a result of the Assigned Royalties shall be credited to Assignor in such calculations, provided that all Costs (defined below) and any other amounts due to Assignee under this Agreement have been paid and/or set-off, as provided by this Agreement.

3. **Assignor's Representations, Warranties and Covenants**. Assignor hereby represents, warrants and covenants to Assignee that as of the Effective Date:

a. Assignor: (i) owns the Assigned Royalties free and clear of any mortgage, pledge, lien, charge, security interest, encumbrance, restriction or adverse claim of any nature whatsoever (collectively, "Liens"), other than any tax obligation that Assignor must satisfy in connection with the purchase and sale of the Assigned Royalties hereunder; (ii) is not aware of any Liens being asserted against the Assigned Royalties; (iii) has not consented to the imposition of any Liens on the Assigned Royalties; and (iv) has not sold, assigned, transferred or otherwise encumbered any of Assignor's rights in the Assigned Royalties to any person or entity other than Assignee. Assignor does not receive Assigned Royalties from any Payment Issuer or other party other than Assignor's Payment Issuer.

b. Assignor is competent to enter into (and understands the terms of) this Agreement and has been represented by tax and accounting advisors and legal counsel in the negotiation and execution of this Agreement, or knowingly waived Assignor's right to do so.

c. Assignor acknowledges that the Assignment Price represents the reasonably equivalent present value of the Masters and the Assigned Royalties, after discounting the future Assigned Royalties to their current present value and taking into account the risk that some or all of the Assigned Royalties may never be paid or payment may be delayed; and Assignor is not entering into this Agreement with the intent to hinder, delay or defraud any of Assignor's creditors, but rather to receive a guaranteed cash payment from Assignee now and to avoid the delay and uncertainty associated with future royalties.

d. Assignor intends to (and shall) fully and timely satisfy all tax obligations of Assignor flowing from this Agreement, either from the proceeds Assignor receives from Assignee hereunder or from other assets of Assignor.

e. If Assignor is married, then Assignor has discussed this transaction with his or her spouse, and such spouse has expressly approved this transaction by executing the Spousal Consent included in Exhibit 2 and expressly waived any marital property right he or she may have in the Assigned Royalties.

f. Assignor shall indemnify, defend and hold harmless Assignee, its agents, attorneys, employees, officers, directors, successors and assigns (collectively, the Indemnified Parties") from and against all claims, losses, damages, penalties, judgments, lawsuits and all related costs and expenses of any nature, including attorney's fees and costs in any proceeding to enforce or defend Assignee's rights under this Agreement (collectively, "Costs"), which may be incurred by or asserted against any of the Indemnified Parties arising out of, related to, or in connection with, this Agreement or any rights assigned or granted to Assignee hereunder, the Masters, or any breach or alleged breach by Assignor of Assignor's obligations, agreements, covenants, representations and/or warranties in this Agreement. Notwithstanding anything to the

contrary contained herein: (i) the Minimum Income shall be automatically increased by an amount equal to any and all Costs to which Assignor's indemnity applies which have not been reimbursed to the Indemnified Parties by Assignor; and (ii) without limiting Assignee's rights or remedies in any manner, Assignee shall have the right to give written notice to Assignor's Payment Issuer to direct payment to Assignee of an amount equal to any and all Costs to which Assignor's indemnity applies from any and all royalties or other sums payable by Assignor's Payment Issuer to Assignor or to any publishing entity owned or controlled by Assignor (in whole or in part).

g.    Assignor hereby agrees that, if at any time prior to the Termination Date, Assignor receives any payment from Assignor's Payment Issuer in respect of the Assigned Royalties, any such amounts received by Assignor will be received for the account of Assignee and will be held in trust for Assignee's benefit and paid over to Assignee immediately upon receipt by Assignor.

h.    Assignor has all necessary right, power, legal capacity and authority, and all necessary actions on the part of Assignor (including action required to be taken by Assignor's officers, directors, shareholders, trustees, executors or representatives) have been duly and validly taken to authorize Assignor: (i) to own the Assigned Royalties; (ii) to sell, assign and transfer the Assigned Royalties as provided herein; (iii) to effectuate the execution and delivery of this Agreement; (iv) to execute and deliver those documents and instruments referred to in the Schedules and Exhibits of this Agreement, and all other reasonably necessary documents or instruments contemplated hereby; and (v) to perform the terms, conditions, and obligations hereof and the transactions contemplated hereby. No approvals or consents of any persons or entities other than Assignor are necessary in connection therewith. This Agreement is legal, valid, and binding upon Assignor and is enforceable in accordance with its terms.

i.    No person holds a power of attorney on behalf of Assignor affecting, directly or indirectly, the interests which are the subject matter of this Agreement.

j.    As of the date of execution of this Agreement, Assignor has no outstanding, unrecouped, and unearned advances in respect of or affecting the Assigned Royalties.

k.    All federal, state and local taxes accrued or owing to and including the date of execution of this Agreement arising out of or in connection with the Assigned Royalties, including without limitation, any sales or transfer taxes resulting from the transaction contemplated herein, if any, have been or will be paid or caused to be paid by Assignor. The Assigned Royalties are free and clear of any and all liens, charges, mortgages, pledges, claims (including ownership or copyright claims of parties other than Assignor or Assignor's Payment Issuer), encumbrances, obligations or liabilities of any kind or nature whatsoever whether accrued, absolute, contingent or otherwise.

l.    Assignor has had the opportunity to obtain legal, financial, and tax advice, and Assignor has not received or relied on legal, financial, or tax advice from Assignee or its agents.

m.    Assignor shall execute any documents required to effectuate the terms and performance of this Agreement, including the following documents attached to this Agreement as Collective Exhibit 2: (i) Spousal Consent; (ii) Funding Instructions; (iii) Return of Non-Assigned Payments; (iv) Authorization to Release Information; (v) a direct pay authorization; and (vi) Sound Exchange Assignment Form (and any such other forms as Assignor's Payment Issuer may require).

n.     Assignor hereby irrevocably grants Assignee a limited power of attorney and appoints Assignee as its attorney-in-fact to take all actions necessary to receive, deposit, and negotiate all checks, remittances or payments of any kind relating to the Assigned Royalties to effectuate the purpose of this Agreement.

o.     Assignor understands that if Assignor is subject to back up tax withholding or other law or order, Assignee will withhold such required amounts from the Assignment Price and remit such payment in accordance with applicable law or order.

p.     Assignor acknowledges and understands that when processing Assignor's assignment of the Assigned Royalties to Assignee in accordance with this Agreement, Assignor's Payment Issuer may change the payment period of Assignor's royalty payments.

4.     **Termination of Assignment; Return of Excess Assigned Royalties**.  Upon Assignee's receipt of the Minimum Income, or if the Assignor exercises of its repurchase rights described in Paragraph 2, the rights granted and assignments made to Assignee in subparagraphs 1.a and 1.b above shall terminate automatically upon the Termination Date.  If Assignee receives any Assigned Royalties after the Termination Date, then Assignee shall refund such Assigned Royalties to Assignor within fourteen (14) business days of Assignee's receipt thereof.

5.     **Continuation of Payment Issuer Affiliation Agreements**.

a.     Until the Termination Date, Assignor covenants and agrees that Assignor: (i) will not voluntarily terminate Assignor's affiliation or membership agreements with Assignor's Payment Issuer ("Assignor's Affiliation Agreements"); (ii) will use Assignor's best efforts to avoid any involuntary termination of Assignor's Affiliation Agreements; (iii) will use Assignor's best efforts to prevent any of the representations or the warranties made by the Assignor hereunder to become untrue or inaccurate in any respect; and (iv) will register with Assignor's Payment Issuer each and every Composition which, prior to the Termination Date, is commercially exploited or is approved for or licensed for commercial exploitation.

b.     Without limiting the generality of the foregoing, Assignor agrees that Assignor shall not, prior to the Termination Date, attempt to re-register, remove, move, re-direct or disassociate (each a "change") all or any of the Masters from Assignor's Payment Issuer or any other organization or entity paying Assigned Royalties to Assignee.  Notwithstanding the foregoing, Assignor agrees that if, prior to the Termination Date, Assignor is required by law to re-register, remove, move, re-direct or disassociate all or any of the Masters from Assignor's Payment Issuer or any other organization or entity that is paying Assigned Royalties to Assignee, Assignor agrees to notify, in writing, Assignee at least sixty (60) days in advance of said change.  Such notice shall include the titles of all of the Masters which shall be the subject matter of such change, and the particular change to be made.  Assignor further agrees to cooperate with Assignee and take whatever actions are necessary, complete and execute any necessary paperwork, documents and instruments and submit same to the new Payment Issuer (s) so that the entire grant and assignment agreed upon in this Agreement shall continue to be paid to Assignee uninterruptedly.  If Assignor fails to notify Assignee such that Assignee cannot obtain the Assigned Royalties due Assignee under this Agreement within sixty (60) days after any change, Assignor agrees to immediately pay Assignee one hundred percent (100%) of the

Assignment Price plus eighteen percent (18%) interest compounded quarterly from the Effective Date. Additionally, Assignor agrees that any royalties collected by Assignor which should have been paid to Assignee under this Agreement will be paid directly to the Assignee by the Assignor within fifteen (15) days after Assignor's receipt thereof. Any delay in payment of such royalties due to Assignee will be subject to payment of interest at a rate of two percent (2%) per month on those amounts.

        c.    Until Assignee receives the Minimum Income, Assignor hereby grants Assignee the right to control and modify Assignor's on-line account with his Payment Issuer, including but not limited to change the user name, password, email address, and contact information. To the extent necessary, and at Assignor's request, Assignee shall provide Assignor with the quarterly statements issued by the Payment Issuer. Assignor further assigns to Assignee all of Assignee's right to audit or review the books and records of the Payment Issuer.

        d.    Until Assignee receives the Minimum Income, Assignor shall not take any action to sell, transfer or assign Assignor's rights in and to the copyright(s) which generate the Assigned Royalties for the Masters.

6.    **Instructions to Assignor's Payment Issuer**. Simultaneously with the execution of this Agreement, Assignor shall execute the Sound Exchange Assignment Form (the " Payment Issuer Forms") included in Exhibit 2 (and shall execute any such other forms as Assignor's Payment Issuer may require), which Assignee shall deliver to Assignor's Payment Issuer, directing Assignor's Payment Issuer to pay the Assigned Royalties to Assignee. Assignor shall not attempt to modify the terms of the Payment Issuer Form or notify Assignor's Payment Issuer that Assigned Royalties should no longer be directed to Assignee prior to the Termination Date. Promptly following the Termination Date, Assignee shall notify Assignor's Payment Issuer that the Payment Issuer Form is no longer in effect and, if required by Assignor's Payment Issuer to effect termination of the assignment to Assignee, Assignee shall execute and deliver to Assignor's Payment Issuer an assignment of the Assigned Royalties to Assignor. Assignor consents to Assignee filing a UCC-1 Financing Statement in the locale and manner as Assignee deems necessary and to provide Publisher with notice of this assignment to perfect Assignee's interest in and to the Assigned Royalties.

7.    **Set Off**. Any amounts due to the Assignee under any other agreement between the Assignee and Assignor, may, at any time after the occurrence of a default under this Agreement or any other agreement between the Assignee and Assignor, be applied to or set off by the Assignee against any amounts due and payable to the Assignee under this Agreement. The Assignee agrees to notify the Assignor promptly after any such application or setoff; provided that any failure by Assignee to so notify the Assignor shall not invalidate any such application or setoff.

8.    **Assignment**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs, executors and

administrators. Neither party may assign any of its rights hereunder; provided, however, that Assignee may assign this Agreement or any of its rights hereunder to a third party.

9.     **Governing Law, Arbitration, and Consent to Jurisdiction**. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois (without regard to its conflicts of law doctrines) as if this Agreement were entered into and wholly to be performed therein. Any and all claims or disputes challenging the validity or enforceability of this Agreement or arising from or relating to this Agreement, its formation, terms, and/or the parties' representations, obligations, and performance thereunder will be submitted to binding commercial arbitration conducted in Florida by a single arbitrator selected by the American Arbitration Association (AAA) under AAA's commercial arbitration rules. If any legal action or other proceeding is brought for the enforcement of this Agreement or as a result of a breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs insured in such action or proceeding in addition to any other relief to which such party may be entitled.

10.     **Confidentiality**. The parties agree to keep this Agreement confidential and not to disclose the existence or the terms to any third parties. However, Assignee shall disclose the Agreement to the Assignor's Payment Issuer to the extent necessary to effectuate the terms of this Agreement.

**THIS SPACE LEFT BLANK INTENTIONALLY**

11.    **Merger Clause**. This Agreement is the entire agreement between the parties and supersedes any negotiations or oral statements made by either party.

Sound Royalties, LLC

By: _____

Its: _____

Robert Blom
Payment Issuer Account numbers:
Sound Exchange:1000129403

The foregoing instrument was acknowledged before me this _____ day of _____, 2018 by the above signed, who is either (☐) personally known to me or (☒) who has produced _____ as identification.

_____
Notary Signature
A Notary Public in and for the State of _____
Printed Name: _____
Commission Expires: _____

OFFICIAL SEAL
LISA HUEMANN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES.02/08/19


Sound Royalties
Money for all music.

Exhibit 1

| Year | Minimum Income |
|------|----------------|
| 1 | $ 20,129.23 |
| 2 | $ 18,190.54 |
| 3 | $ 16,438.57 |



Sound
Royalties
Money for all music.

## Schedule "A"

The term "Compositions" includes the attached: (i) all musical compositions or works registered to Assignor's Distributor Accounts (including, but not limited to those musical compositions and works set forth in the schedule below) and (ii) any other musical compositions or works written, owned or controlled by Assignor prior to the Termination Date.


Sound
Royalties
Money for all music.

Exhibit 2
Ancillary Documents



Sound
Royalties
Money for all music.

## ROYALTY ASSIGNMENT AGREEMENT

THIS ROYALTY ASSIGNMENT AGREEMENT ("Agreement") is entered into as of August 2, 2019 (hereafter the "Effective Date"), by Sound Royalties, LLC, having a principal place of business at 1641 Worthington Road, Suite 410 West Palm Beach, FL 33409 ("Assignee"), and Robert Blom aka Bob Blom, having a residence/principal place of business at 2802 S Riverside Dr Mchenry, IL 60050-2736 ("Assignor").

NOW, THEREFORE, for valuable consideration, Assignee and Assignor agree as follows:

1. **Assignment**.

    a.    In consideration of the sum of $51,143.64, less a $1,875.84 closing fee paid to Assignee ("Assignment Price"), to be paid by Assignee to Assignor as provided herein, Assignor hereby sells, transfers, absolutely assigns, and conveys to Assignee all of Assignor's right to receive all payments, including any advances or loans, derived solely from the master recordings ("Masters") (collectively, the "Assigned Royalties"). (defined below) paid by Assignor's Payment Issuer up to the Minimum Income set forth on Exhibit 1 (collectively, the "Assigned Royalties"). "Masters" means and includes, individually and collectively, all of the master recordings listed, referenced or referred to on "Schedule A" attached hereto and incorporated by reference herein. **Nothing in this Agreement shall be deemed to be a sale of Assignors catalog of Masters or grant Assignee any rights in any copyright owned by Assignor**.

    b.    (i)    As of the Effective Date and subject to the terms of this Agreement, Assignee shall be entitled to receive all Assigned Royalties directly from Sound Exchange ("Payment Issuer") with whom Assignor is affiliated or a member as of the date hereof and from whom Assignor receives all Assigned Royalties ("Assignor's Payment Issuer"). Accordingly, Assignor shall direct, and take all action necessary and/or required (including the actions required by Section 6 of this Agreement) to cause, Assignor's Payment Issuer to pay the Assigned Royalties, regardless of when earned, directly to Assignee.

    (ii)    **Assignor's Sound Exchange** Featured Artist and Rights Owner account number is 1000129403 ("Assignor's Payment Issuer Account").

    c.    The Assignment Price shall be payable to Assignor promptly following the later of: (i) Assignee's receipt of evidence satisfactory to Assignee that all of Assignor's representations in Paragraph 2 below are true and correct; (ii) the mutual execution and delivery of this Agreement; and (iii) written confirmation from Assignor's Payment Issuer reasonably acceptable to Assignee that the Assigned Royalties shall be paid to Assignee. Assignor can choose to be paid by wire transfer or by check. If Assignor elects to be paid by some other

means, any charges imposed by the bank or money transfer service will be deducted from the Assignment Price. In the event that the transaction contemplated by this Agreement does not fund within 30 days of the Effective Date, Assignee shall have the option to terminate this Agreement with no further obligation to Assignor.

   d.   **This transaction is an assignment of all or a portion of the Assigned Royalties, not a loan.** Assignee shall be responsible for the income taxes attributable to the Assigned Royalties assigned by this Agreement and shall report such payments as income. Assignee shall issue a 1099 to Assignor for the Assignment Price. In the event that the Assignor's Payment Issuer reports the Assigned Royalties as income to the Assignor, such reporting shall be irrelevant to the determination of the tax liability.

2.   <u>Assignor Protections</u>. Assignee and Assignor have estimated the amount of income that the Assigned Royalties will produce during the first 36 months after the Effective Date, and this estimated income is itemized on Exhibit 1 to the Agreement (the "Minimum Income"). In order to mitigate the risk to Assignor of unexpected increases in the amount of the payments from the Assigned Royalties, Assignee and Assignor agree to the following provisions to provide certain protections to Assignor as to any increases in the value of the Assigned Royalties after the Effective Date:

   a.   *Increases in Annual Income Generated by Assigned Royalties*: If the cumulative payments received by Assignee as a result of the Assigned Royalties exceed the annual Minimum Income stated on Exhibit 1 in any year, Assignee agrees to pay to Assignor any such overage within 15 days of receipt. (the "Excess Funds"). Assignee's obligation to make this payment shall be expressly contingent on Assignor's full compliance with the Agreement in all respects, including Assignee's receipt of the Minimum Income for all prior years and that no unpaid costs, expenses, or any other amounts are due from Assignor to Assignee under this Agreement. In determining Assignee's obligations under this paragraph, the parties agree that the time periods set in this provision shall commence upon the Effective Date.

   b.   *Early Repurchase Option*: At any point prior to the Termination Date, Assignor shall have the right to repurchase the Assigned Royalties from Assignee by paying to Assignee an amount equal to the Minimum Income minus the total amount of Assigned Royalties Assignee has received as of the repurchase date. Upon such payment to Assignee, Assignee shall terminate this Agreement and execute any necessary documents to assign, transfer, and convey the Assigned Royalties to Assignor. The Assignor's ability to buy back the Assigned Royalties under this sub-paragraph (b) shall be strictly construed on the terms stated herein.

   c.   *Delayed Repurchase Rights*: At any point after that date that is greater than 36 months after the Effective Date, Assignee shall have the right to terminate Assignor's rights to repurchase any of its interests in the Assigned Royalties by written notice of such proposed termination to Assignor, which shall provide Assignor 30 days' notice and opportunity to exercise the delayed repurchase option granted in this sub-paragraph (c). If Assignee has not terminated such repurchase rights, however, Assignor shall retain the right to exercise a delayed repurchase of the Assigned Royalties by paying the Repurchase Amount, plus an increase of such amount by 5% per quarter (commencing 36 months after the Effective Date) until such aggregate amount is paid (this amount shall be referred to as the "Delayed Repurchase

Amount"). The date of Assignee's actual receipt, if any, of the Early Repurchase, or the Delayed Repurchase Amount shall be referred to as the "Termination Date."

d. *Credits for Income Received by Assignee*: In calculating the amounts of the Early Repurchase, and/or the Delayed Repurchase Amount, Assignee and Assignor agree that any and all amounts received by Assignee as a result of the Assigned Royalties shall be credited to Assignor in such calculations, provided that all Costs (defined below) and any other amounts due to Assignee under this Agreement have been paid and/or set-off, as provided by this Agreement.

3.    **Assignor's Representations, Warranties and Covenants**.  Assignor hereby represents, warrants and covenants to Assignee that as of the Effective Date all of the following are accurate and that Assignee shall rely upon such representations in completing the transaction contemplated by this Agreement:

a.    Assignor: (i) owns the Assigned Royalties free and clear of any mortgage, pledge, lien, charge, security interest, encumbrance, restriction or adverse claim of any nature whatsoever (collectively, "Liens"), other than any tax obligation that Assignor must satisfy in connection with assignment of the Assigned Royalties hereunder; (ii) is not aware of any Liens being asserted against the Assigned Royalties; (iii) has not consented to the imposition of any Liens on the Assigned Royalties; and (iv) has not sold, assigned, transferred or otherwise encumbered any of Assignor's rights in the Assigned Royalties to any person or entity other than Assignee. Assignor does not receive Assigned Royalties from any Payment Issuer or other party other than Assignor's Payment Issuer.

b.    Assignor is competent to enter into (and understands the terms of) this Agreement and has been represented by tax and accounting advisors and legal counsel in the negotiation and execution of this Agreement, or knowingly waived Assignor's right to do so.

c.    Assignor acknowledges that the Assignment Price represents the reasonably equivalent present value of the Masters and the Assigned Royalties, after discounting the future Assigned Royalties to their current present value and taking into account the risk that some or all of the Assigned Royalties may never be paid or payment may be delayed; and Assignor is not entering into this Agreement with the intent to hinder, delay or defraud any of Assignor's creditors, but rather to receive a guaranteed cash payment from Assignee now and to avoid the delay and uncertainty associated with future royalties.

d.    Assignor intends to (and shall) fully and timely satisfy all tax obligations of Assignor flowing from this Agreement, either from the proceeds Assignor receives from Assignee hereunder or from other assets of Assignor.

e.    If Assignor is married, then Assignor has discussed this transaction with his or her spouse, and such spouse has expressly approved this transaction by executing the Spousal Consent included in Exhibit 2 and expressly waived any marital property right he or she may have in the Assigned Royalties.

f.    Assignor shall indemnify, defend and hold harmless Assignee, its agents, attorneys, employees, officers, directors, successors and assigns (collectively, the Indemnified Parties") from and against all claims, losses, damages, penalties, judgments, lawsuits and all related costs and expenses of any nature, including attorney's fees and costs in any proceeding to

enforce or defend Assignee's rights under this Agreement (collectively, "Costs"), which may be incurred by or asserted against any of the Indemnified Parties arising out of, related to, or in connection with, this Agreement or any rights assigned or granted to Assignee hereunder, the Masters, or any breach or alleged breach by Assignor of Assignor's obligations, agreements, covenants, representations and/or warranties in this Agreement. Notwithstanding anything to the contrary contained herein: (i) the Minimum Income shall be automatically increased by an amount equal to any and all Costs to which Assignor's indemnity applies which have not been reimbursed to the Indemnified Parties by Assignor; and (ii) without limiting Assignee's rights or remedies in any manner, Assignee shall have the right to give written notice to Assignor's Payment Issuer to direct payment to Assignee of an amount equal to any and all Costs to which Assignor's indemnity applies from any and all royalties or other sums payable by Assignor's Payment Issuer to Assignor or to any publishing entity owned or controlled by Assignor (in whole or in part).

g.      Assignor hereby agrees that, if at any time prior to the Termination Date, Assignor receives any payment from Assignor's Payment Issuer in respect of the Assigned Royalties, any such amounts received by Assignor will be received for the account of Assignee and will be held in trust for Assignee's benefit and paid over to Assignee immediately upon receipt by Assignor.

h.      Assignor has all necessary right, power, legal capacity and authority, and all necessary actions on the part of Assignor (including action required to be taken by Assignor's officers, directors, shareholders, trustees, executors or representatives) have been duly and validly taken to authorize Assignor: (i) to own the Assigned Royalties; (ii) to sell, assign and transfer the Assigned Royalties as provided herein; (iii) to effectuate the execution and delivery of this Agreement; (iv) to execute and deliver those documents and instruments referred to in the Schedules and Exhibits of this Agreement, and all other reasonably necessary documents or instruments contemplated hereby; and (v) to perform the terms, conditions, and obligations hereof and the transactions contemplated hereby. No approvals or consents of any persons or entities other than Assignor are necessary in connection therewith. This Agreement is legal, valid, and binding upon Assignor and is enforceable in accordance with its terms.

i.      No person holds a power of attorney on behalf of Assignor affecting, directly or indirectly, the interests which are the subject matter of this Agreement.

j.      As of the date of execution of this Agreement, Assignor has no outstanding, unrecouped, and unearned advances in respect of or affecting the Assigned Royalties.

k.      All federal, state and local taxes accrued or owing to and including the date of execution of this Agreement arising out of or in connection with the Assigned Royalties, including without limitation, any sales or transfer taxes resulting from the transaction contemplated herein, if any, have been or will be paid or caused to be paid by Assignor. The Assigned Royalties are free and clear of any and all liens, charges, mortgages, pledges, claims (including ownership or copyright claims of parties other than Assignor or Assignor's Payment Issuer), encumbrances, obligations or liabilities of any kind or nature whatsoever whether accrued, absolute, contingent or otherwise.

l.      Assignor has had the opportunity to obtain legal, financial, and tax advice, and Assignor has not received or relied on legal, financial, or tax advice from Assignee or its agents.

m.     Assignor shall execute any documents required to effectuate the terms and performance of this Agreement, including the following documents attached to this Agreement as Collective Exhibit 2: (i) Spousal Consent; (ii) Funding Instructions; (iii) Return of Non-Assigned Payments; (iv) Authorization to Release Information; (v) a direct pay authorization; and (vi) Sound Exchange Assignment Form (and any such other forms as Assignor's Payment Issuer may require).

n.     Assignor hereby irrevocably grants Assignee a limited power of attorney and appoints Assignee as its attorney-in-fact to take all actions necessary to receive, deposit, and negotiate all checks, remittances or payments of any kind relating to the Assigned Royalties to effectuate the purpose of this Agreement.

o.     Assignor understands that if Assignor is subject to back up tax withholding or other law or order, Assignee will withhold such required amounts from the Assignment Price and remit such payment in accordance with applicable law or order.

p.     Assignor acknowledges and understands that when processing Assignor's assignment of the Assigned Royalties to Assignee in accordance with this Agreement, Assignor's Payment Issuer may change the payment period of Assignor's royalty payments.

q.     Assignor represents and warrants that the Assignment Price will be used for a business or commercial purpose and not used for personal, family or household purposes. Additionally, the transaction contemplated by this Agreement is the assignment of business assets to Assignee.

4.     **Termination of Assignment; Return of Excess Assigned Royalties**. Upon Assignee's receipt of the Minimum Income, or if the Assignor exercises of its repurchase rights described in Paragraph 2, the rights granted and assignments made to Assignee in subparagraphs 1.a and 1.b above shall terminate automatically upon the Termination Date. If Assignee receives any Assigned Royalties after the Termination Date, then Assignee shall refund such Assigned Royalties to Assignor within fourteen (14) business days of Assignee's receipt thereof.

5.     **Continuation of Payment Issuer Affiliation Agreements**.

a.     Until the Termination Date, Assignor covenants and agrees that Assignor: (i) will not voluntarily terminate Assignor's affiliation or membership agreements with Assignor's Payment Issuer ("Assignor's Affiliation Agreements"); (ii) will use Assignor's best efforts to avoid any involuntary termination of Assignor's Affiliation Agreements; (iii) will use Assignor's best efforts to prevent any of the representations or the warranties made by the Assignor hereunder to become untrue or inaccurate in any respect; and (iv) will register with Assignor's Payment Issuer each and every Composition which, prior to the Termination Date, is commercially exploited or is approved for or licensed for commercial exploitation.

b.     Without limiting the generality of the foregoing, Assignor agrees that Assignor shall not, prior to the Termination Date, attempt to re-register, remove, move, re-direct or disassociate (each a "change") all or any of the Masters from Assignor's Payment Issuer or any other organization or entity paying Assigned Royalties to Assignee. Notwithstanding the foregoing, Assignor agrees that if, prior to the Termination Date, Assignor is required by law to

re-register, remove, move, re-direct or disassociate all or any of the Masters from Assignor's Payment Issuer or any other organization or entity that is paying Assigned Royalties to Assignee, Assignor agrees to notify, in writing, Assignee at least sixty (60) days in advance of said change. Such notice shall include the titles of all of the Masters which shall be the subject matter of such change, and the particular change to be made. Assignor further agrees to cooperate with Assignee and take whatever actions are necessary, complete and execute any necessary paperwork, documents and instruments and submit same to the new Payment Issuer (s) so that the entire grant and assignment agreed upon in this Agreement shall continue to be paid to Assignee uninterruptedly. If Assignor fails to notify Assignee such that Assignee cannot obtain the Assigned Royalties due Assignee under this Agreement within sixty (60) days after any change, Assignor agrees to immediately pay Assignee one hundred percent (100%) of the Assignment Price plus eighteen percent (18%) interest compounded quarterly from the Effective Date. Additionally, Assignor agrees that any royalties collected by Assignor which should have been paid to Assignee under this Agreement will be paid directly to the Assignee by the Assignor within fifteen (15) days after Assignor's receipt thereof. Any delay in payment of such royalties due to Assignee will be subject to payment of interest at a rate of two percent (2%) per month on those amounts.

   c. Until Assignee receives the Minimum Income, Assignor hereby grants Assignee the right to control and modify Assignor's on-line account with his Payment Issuer, including but not limited to change the user name, password, email address, and contact information. To the extent necessary, and at Assignor's request, Assignee shall provide Assignor with the quarterly statements issued by the Payment Issuer. Assignor further assigns to Assignee all of Assignee's right to audit or review the books and records of the Payment Issuer.

   d. Until Assignee receives the Minimum Income, Assignor shall not take any action to sell, transfer or assign Assignor's rights in and to the copyright(s) which generate the Assigned Royalties for the Masters.

6. **Instructions to Assignor's Payment Issuer**. Simultaneously with the execution of this Agreement, Assignor shall execute the Sound Exchange Assignment Form (the " Payment Issuer Forms") included in Exhibit 2 (and shall execute any such other forms as Assignor's Payment Issuer may require), which Assignee shall deliver to Assignor's Payment Issuer, directing Assignor's Payment Issuer to pay the Assigned Royalties to Assignee. Assignor shall not attempt to modify the terms of the Payment Issuer Form or notify Assignor's Payment Issuer that Assigned Royalties should no longer be directed to Assignee prior to the Termination Date. Promptly following the Termination Date, Assignee shall notify Assignor's Payment Issuer that the Payment Issuer Form is no longer in effect and, if required by Assignor's Payment Issuer to effect termination of the assignment to Assignee, Assignee shall execute and deliver to Assignor's Payment Issuer an assignment of the Assigned Royalties to Assignor. Assignor consents to Assignee filing a UCC-1 Financing Statement in the locale and manner as Assignee deems necessary and to provide Publisher with notice of this assignment to perfect Assignee's interest in and to the Assigned Royalties.

7.    **Set Off**.  Any amounts due to the Assignee under any other agreement between the Assignee and Assignor whether made prior, contemporaneously with, or after this Agreement, may, at any time, be applied to or set off by the Assignee against any amounts due and payable to the Assignee under this Agreement.  The Assignee agrees to notify the Assignor promptly after any such application or setoff; provided that any failure by Assignee to so notify the Assignor shall not invalidate any such application or setoff.

8.    **Assignment**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs, executors and administrators.  Neither party may assign any of its rights hereunder; provided, however, that Assignee may assign this Agreement or any of its rights hereunder to a third party.

9.    **Governing Law and Consent to Jurisdiction**. This Agreement is governed by and shall be construed in accordance with the laws of the state of Florida, without regard to conflict of law principles.  Any action or proceeding relating in any way to this Agreement may be brought and enforced only in the state courts of Palm Beach County, Florida, and the parties irrevocably submit to the jurisdiction of such courts in respect of any such action or proceeding.  The parties irrevocably waive, to the fullest extent permitted by law, any objection that they may now or hereafter have to the laying of venue of any such action or proceeding in the state courts of Palm Beach County, Florida and any claim that any such action or proceeding brought in any such court has been brought in any inconvenient forum.  To the fullest extent permitted by law, the parties hereby irrevocably consent to the service of process in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to it at its address as set forth herein. If any legal action or other proceeding is brought for the enforcement of this Agreement or as a result of a breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs insured in such action or proceeding in addition to any other relief to which such party may be entitled.

10.   **Confidentiality**.  The parties agree to keep this Agreement confidential and not to disclose the existence or the terms to any third parties.  However, Assignee shall disclose the Agreement to the Assignor's Payment Issuer to the extent necessary to effectuate the terms of this Agreement.

**THIS SPACE LEFT INTENTIONALLY BLANK**

11.    **Merger Clause**. This Agreement is the entire agreement between the parties and supersedes any negotiations or oral statements made by either party.

Sound Royalties, LLC

By: _____

Its: _____

_____
Robert Blom AKA Bob Blom
Payment Issuer:Sound Exchange
Featured Artist and Rights Owner
Account number: 1000129403

The foregoing instrument was acknowledged before me this 2nd day of August, 2019 by the above signed, who is either (☐) personally known to me or (☒) who has produced _____ as identification.

_____
Notary Signature
A Notary Public in and for the State of IL
Printed Name: C Cerda
Commission Expires: _____

C CERDA
Official Seal
Notary Public – State of Illinois
My Commission Expires Dec 9, 2021


Sound
Royalties
Money for all music.

Exhibit 1

| Year | Minimum Income |
|------|----------------|
| 1 | $ 32,389.76 |
| 2 | $ 29,270.24 |
| 3 | $ 26,451.16 |



Sound
Royalties
Money for all music.

Schedule "A"

The term "Masters" includes all musical works registered with Sound Exchange, including but not limited to the attached schedule and any other musical works registered with Sound Exchange after the execution of this Agreement.



Exhibit 2
Ancillary Documents